CUBBEDGE & HAZELHURST, plaintiffs in error, *vs.* O. F. ADAMS, defendant in error.

As a general rule, a Court of Equity will not interfere at the instance of a general creditor, before judgment, to set aside a voluntary conveyance alleged to have been made for the purpose of defrauding creditors, and restrain by injunction the sale of property held by the debtor under that voluntary conveyance as trustee or in his own right, on the ground of fraud, when the fraud alleged is the *execution of such voluntary conveyance without notice to the creditors.*

The original jurisdiction to grant, or refuse to grant, or to continue, or refuse to continue an injunction in an equity cause, is vested by the Constitution and the laws of this State, in the Superior Courts or in the several Judges thereof as regulated by law, who may, in the performance of that duty so devolved on them, exercise a sound discretion as to the granting or refusing an injunction, according to the circumstances of each case presented for their consideration.

This Court has no original jurisdiction to grant or to refuse an injunction, but is alone a Court for the *correction of errors* from the Superior Courts and City Courts; and unless it is manifestly apparent, from the record, that the Judge of the Superior Court has abused the discretion vested in him by law, either in granting or refusing to grant an injunction, there is no error which this Court can correct; and according to the facts as presented by the record in this case, there was not such an abuse of that discretion which the law has vested in the Judge of the Court below, in refusing to grant the injunction prayed for, as will authorize this Court to control it.

Inasmuch as the answer of the defendant was not filed under the order or process of the Court requiring the defendant to answer complainant's bill, but was voluntarily filed by him by way of showing cause against granting the injunction, it was to be considered by the Judge for what it was worth, in the shape in which he voluntarily chose to present it, and the complainants did not have the legal right to com-

Cubbedge & Hazlehurst *vs.* Adams.

plain of his action in regard to that matter; nor did the Judge err in refusing to allow the complainants to examine the defendant *orally* as a witness, on a motion to grant an injunction.

Equity Practice. Injunction. Before Judge COLE. Bibb County. Chambers. December, 1870.

On the 29th of November, 1869, Cubbedge & Hazlehurst filed a bill against Adams, making this case. They are bankers and brokers, and Adams is a cotton buyer; all live in Macon, Georgia. Adams has been one of their customers, for several years; has procured large advances of cash from them; has occasionally been largely in their debt, and, on such occasions, secured them against loss, as far as he could. Up to the close of their business relations, he always asserted his readiness, and ability to protect them against loss, for advances. From the foregoing facts, they placed implicit confidence in Adams' said assurances. Besides, Adams frequently exhibited to them his monetary *status*, to induce them to continue such advances, and to satisfy them of the safety in so doing. Up to the closing of their account, they believed that all Adams' property was pledged, as a security. for such advances. At the close of the cotton season of 1869–70, Adams owed them $9,308 97, and they paid a small amount for him since. Calling upon him for a settlement, they were astonished to find that he could not settle, and, upon inquiry, learned that Adams has conveyed all his property, with unimportant exceptions, to one Flanders, of Macon, his brother-in-law, in trust, for the wife and children of Adams, as appeared by a copy of the deed exhibited. The deed was made on the 22d of September, 1869; its consideration was "love and affection," and it conveyed to Flanders, in trust, for Mrs. Adams and her children, by Adams, *in esse*, or to be *in esse*, free from the disposition and contracts of Adams, with power in her to change the trustee, and with power in him to sell, with her written consent, without applying to any Court. It conveyed Adams' residence, and all his

household and kitchen furniture, part of lot number six, south half of number one, square number fifty-eight, numbers sixteen and seventeen, all in Macon, and twelve hundred and eighty acres of land in Missouri. This deed was recorded in Bibb county, on the 8th of March, 1870. This deed was made to defraud them, and other creditors, and it was withheld from record, that Adams might continue to get credit upon faith of his owning said property, and that, too, when, as they believe, he was insolvent. At the date of said deed, Adams owed them $7,900 00, and, without giving them any notice of his deed, he continued business with them without means to secure or pay them. Further, Flanders has been discharged, and Adams has been substituted as trustee. Under said deed, he has sold two pieces of property covered by said deed, and has advertised other portions of it for sale. Adams admits that he used the proceeds of said sale as if the money belonged to him absolutely. His family have enjoyed the money advanced by them to him, and said property conveyed is subject to the payment of their demand, whether this deed be annulled or not. They have reason to believe, and do believe, that Adams will sell all of said property, and convert its proceeds to his own use, unless he be enjoined. They prayed for an answer to said allegations, that said deed be declared void as to them, and that Adams be made to pay them said account. The Chancellor granted a temporary injunction, and ordered Adams to shew cause why it should not be continued.

He made the following answer, in response to said order: He admitted that he was in their debt, on the 22d of September, 1869, and said that indebtedness was in this way: They held his note for $4,025 00, made on the 3d of September, 1869, secured by a deposit of one hundred and seventy-nine shares of stock, in the Macon and Brunswick Railroad Company. Soon after, but perhaps after the 22d of September, 1869, they sold one hundred of said shares for $3,300 00, and applied that to the part payment of said note, and they

hold the other shares yet. Besides this, as appears by his bank book, he owed them on the 22d of September, 1869, $7,930 20. On the 23d of September, 1869, he deposited with them $7,197 55, and on that day issued checks amounting to only $107 17; so that, exclusive of said note, and leaving out any reckoning of usury, he owed them when the deed was made $839 82. Said deposit was proceeds of cotton owned and held by him, on the 22d of September, 1870. Estimating said stock at $30 00 per share, said shares would overpay said note by $1,341 00, which added to said deposit would overpay all of said indebtedness.

When said deed was made, he kept out realty and railroad stock in Georgia worth, as he believes, $6,400 00, besides an interest in two lots, supposed to contain copper, for which he would take $5,000 00; it was worth but little if it has no copper. Since making said deed he has sold considerable of the realty, not covered by the deed, and this he was compelled to do, to prevent possible loss on cotton bought since the deed was made. This deed was not made to defraud any creditor; loss was not then anticipated, and his property outside of said deed, was on the 22d of September, 1867, sufficient to pay all his debts, except some advances which had been made by his father-in-law, which he regarded when they were made, as debts which would never harrass or oppress him, and so he has been assured by his father-in-law; the larger part of these were used in paying for said residence, and he regarded it as a gift to his wife, rather than a debt against him. He made the deed simply to protect his family against possible losses by him in business. Before he did it, he was advised by Hazlehurst to make such provision, and he told him he would. Since making it he sold one of the lots covered by it, at $900 00, and used the money, (so far as used at all), in family expenses; he may have used part of complainants' advances in the same way, but the bulk of them was used in purchasing cotton.

During the several years of his business with complain-

ants, they charged him from two to two and a half *per cent.* per month as interest, and this usurious interest is necessary to make up said claim against him.   What part is usury he does not know accurately, but the commissions and interest charged by them against him, from the 19th of August, 1867, to the 9th of October, 1869, is $1,847 02.   What interest was charged from January, 1866, to the 19th of August, 1867, he does not know; the interest charged from the 9th of October, 1869, to the 17th of August, 1870, is $1,615 26. He claims this usury as a credit.

Complainants then submitted affidavits of the following purport.   Hazelhurst affirmed that he had had a conversation with Adams, touching a settlement on his family, before the date of said deed, to-wit: in the spring of 1868, when Adams had been successful and could make a settlement and have enough to pay his debts besides; that this was merely a casual conversation.   Adams did not say he would, and did not tell him that he had done so, nor ever alluded to the subject, and the setlement was discovered by accident; and that complainant did not charge two and a half *per cent.* interest per month, as stated in the answer, so far as he could discover from the firm books.   Cubbedge affirmed that Adams had frequently said to him that he owed his father-in-law, Flanders, more than he owed complainants, and regarded it as a debt; said they had not charged him usury as stated in his answer; has admitted that his family got, in the aggregate, as much as a year's support out of their advances; that, since said deed was made, Adams has more than once treated the property covered by it as his own, and used a part of the proceeds of that which was sold.   He and Hazelhurst both affirmed that Adams had, by assurances, etc., led them to believe all his property was bound for their advances, and this last was affirmed also by their bookkeeper.   Further, he said, no collateral was ever required for any balance or draft, but they dealt with him upon the faith of his having property sufficient to meet the same, and the relations of

the parties in business were very confidential; he also says they never charged Adams usury, as claimed by him in his answer.

Other affidavits stated the indebtedness of Adams, on the 22d of September 1869, as follows: To Rice & Davis, Boston, $4,000 00; to Hardeman & Sparks, $1,852 24; to Harris, Clay & Company, $29 35; to S. Anderson, $78 62; to S. T. Coleman, $194 13; to J. L. Shea, $85 00; to F. Lake, $375 00; to J. H. Hertz & Company, $67 00; to A. P. Collins, $75 00; to Heath, Tax Collector, $181 00; to Singleton, Hunt & Company, $57 00; to Mix & Kirtland, $41 15; to J. W. Burke & Company, $54 66; to the City of Macon, $135 00.

In support of his answer, Adams affirmed that the conversation alluded to in his answer, when Hazelhurst advised him to make such settlement, occurred just before he did make it, on the sidewalk opposite Strong's store; that his indebtedness was several hundred dollars less, when said deed was made, than he had stated in said answer; that Hardeman & Sparks' debt was for cotton bought before the 22d of September, 1869, and then on hand; the draft drawn against it was deposited with complainants, and when the cotton was sold, its proceeds were applied to the payment of the draft; that the Rice & Davis debt was for cotton shipped to them; a draft was drawn in favor of complainants against it, the cotton was sold, paid the draft, and left a surplus of $390 00, which should be added to his assets; that he has paid said debts due to Heath, tax-collector, Burke & Company, and City of Macon, and part of some others of said debts mentioned in affidavits aforesaid; that, excepts Shea's and Hertz's, said demands were for family supplies and taxes and work on the residence lot; Shea's and Hertz's being for clothing, mostly for himself, and that he either thought some of said accounts were paid or overlooked them in estimating his indebtdness. Flanders affirmed that, as to the advances made by him to improve said residence, he supposed Adams and his family

always considered them as a gift to the family, and that he never intended embarrassing Adams in any way with respect to them.

After reading these pleadings and affidavits, complainant's counsel proposed to except to Adams' answer and have him answer over. The Chancellor would not allow it, saying it could not be done upon this motion; but that if it were evasive or insufficient, he would consider it in deciding upon the injunction. They then proposed to swear Adams, (who was present,) and examine him orally touching the matters in which they thought his answer insufficient and evasive, and as to the whole controversy. Adams' counsel objected and the Chancellor would not allow that done. It was admitted that counsel for Adams had been asked before the hearing if he would consent to have Adams so examined, and that he refused, and that he was also asked if he would advise Adams to refuse to give complainant's counsel an *ex parte* affidavit to be used against him, and said he would not. (Counsel said here in argument, that he so objected and refused only because said requests were illegal, and not because he feared Adams had withheld any part of the truth.)

After argument, further injunction was refused, and the temporary one set aside. Complainant's counsel say the Court erred in refusing to allow them to except to said answer, and to examine Adams orally, and in refusing the injunction prayed for.

NESBITS & JACKSON, for plaintiff's in error, cited as to the right to except: 1st Tr's Edn. on Inj., 127; 2 Dan. Ch. Pr., 872, 877; 13th Ga. R., 140; 26th, 152; 27th, 210; 9th, 95. As to the oral examination, Code, secs. 3697, 3757, *et seq.* Voluntary settlement void against creditors: Code, secs. 1942, 1768. Creditors may go into equity to set it aside: Code, secs. 1935, 1936, 1937, 2709, 3040, 3041, 3115, 3116, 3118, 3121, 3127. Remedy is incomplete without injunction: Code, secs. 3149, 2598, 3037, 3064; 6th Cranch.

Peyton *vs.* Lamar *et al.*

R., 87; 12th Peters, 11; 2 Call., 183; 2 Munf., 368; 2 Brockenboro, 152 note; R. M. Charlton, 380, 358; 8th Ga. R., 444; 19th, 230, 404; 20th, 210; and equity will intervene before judgment: Code, secs. 3040, 3149, 3159, 4119; 36th Ga. R., 534; 33d, 672.

LAMAR & ANDERSON, for defendant.

WARREN, J.

In reviewing the allegations made in the complainant's bill, the answer of the defendant, and the affidavits filed by the respective parties in support of, and in opposition to, the granting the injunction prayed for, we find no error which will authorize this Court to control the sound discretion of the Judge below, in refusing to grant the injunction.

Let the judgment of the Court below be affirmed.